## UNITED STATE DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COHNREZNICK LLP, | Case No.: 1:20-cv-00349-LTS-KHP |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| MAZARS USA LLP, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff CohnReznick LLP ("CohnReznick" or the "Partnership"), by and through its attorneys, Reed Smith LLP, hereby alleges against Defendant Mazars USA LLP ("Mazars") as follows:

### PRELIMINARY STATEMENT

1.      CohnReznick is a national accounting, tax and business advisory firm. CohnReznick secures, maintains and grows its business by keeping its top talent and protecting the confidential and proprietary information and trade secrets it spent decades developing. CohnReznick, however, recently learned that Mazars, an industry competitor, and three former CohnReznick partners—Robert DeMeola ("DeMeola"), Alan Wohl ("Wohl") and Howard Leung ("Leung")—have hatched a carefully-orchestrated scheme to raid CohnReznick's New York office and are exploiting CohnReznick's confidential and proprietary information and trade secrets to solicit and retain CohnReznick's clients, partners and employees.  Moreover, even after CohnReznick formally demanded in late November 2019 that this misconduct cease, Mazars continued to solicit and retain additional CohnReznick clients and employees and, upon information and belief, Mazars even advised DeMeola, Wohl and Leung that the controlling partnership agreement is unenforceable, including the restrictions on soliciting partners and employees and their obligation to maintain confidentiality.  Furthermore, Mazars (using DeMeola,

Wohl and Leung) knowingly misappropriated CohnReznick's confidential and proprietary information and trade secrets, including detailed pricing history for many of its clients, to improperly and unfairly compete against CohnReznick and lure such clients away from CohnReznick and to Mazars.  As set forth fully below, such acts by Mazars constitute tortious interference with CohnReznick's contractual relationships and give rise to other federal statutory and common law claims.

2.      By way of background, DeMeola joined CohnReznick in 1999, held the position of the Managing Partner of the New York Office and was promoted to Chief Operating Officer in 2010.  DeMeola worked extensively with two other partners—Wohl and Leung—who joined CohnReznick in 2001 and 2005, respectively.  DeMeola, Wohl and Leung are sophisticated Certified Public Accountants with decades of experience.  They were each also paid handsomely under the same partnership agreement Mazars now speciously argues is unenforceable.

3.      As conditions to their partnership and in consideration for the handsome consideration they received, DeMeola, Wohl and Leung each executed the Sixth Amended and Restated Partnership Agreement of CohnReznick LLP (the "Partnership Agreement").  Under the Partnership Agreement, DeMeola, Wohl and Leung agreed:

   a. not to disclose "Confidential Information" (*see* Partnership Agreement §§ 5.3, 5.7(e));

   b. to return to CohnReznick all "Confidential Information" promptly after their retirement, withdrawal or termination from CohnReznick (*id*.);

   c. not to "directly or indirectly, solicit, employ, interfere with or entice from the Partnership or any affiliate of the Partnership" certain employees and partners  (*id*. § 14.3);

   d. to compensate CohnReznick if, after joining another firm, they or their new firm provided "services" to a "client of the Partnership" (*id*. § 11.4);

    e.   to purchase, at face value, any unpaid receivables due and work in progress charged to the "client of the Partnership" that they serviced existing at the time they first began servicing the "client of the Partnership" at their new firm (*id*. § 11.4(c)); and

    f.   to promptly inform CohnReznick after becoming obligated to compensate CohnReznick for lost clients, provide CohnReznick with an accounting, and to make their "records available for inspection in the event an inquiry is made as to whether any, and the extent of, services were rendered by a Servicer to a 'client of the Partnership'" (*id*. § 11.4(e)).

4.     After nearly 20 years of service, DeMeola "retired" from CohnReznick in January of 2019. DeMeola joined Mazars a few months later.

5.     Upon information and belief, despite Mazars' own partnership agreement containing similar covenants, Mazars told DeMeola that the covenants and obligations in the Partnership Agreement were unenforceable and should be disregarded. After Mazars gave DeMeola the green light, DeMeola, at Mazars' behest, began trampling on the Partnership Agreement at CohnReznick's expense.

6.     For starters, DeMeola lured Wohl and Leung away from CohnReznick and to Mazars in breach of the Partnership Agreement. In fact, prior to Wohl and Leung announcing their withdrawal from CohnReznick, DeMeola confessed to soliciting Wohl and Leung to join him at Mazars in breach of the Partnership Agreement.

7.     Undeterred, however, DeMeola, Wohl and Leung, at Mazars' instruction, doubled down by poaching two additional CohnReznick employees to join them at Mazars in further breach of the Partnership Agreement. Moreover, even after CohnReznick sent cease and desist letters and initiated this action, Mazars lured more employees away from CohnReznick to Mazars.

8.     CohnReznick's initial internal investigation into Mazars' misconduct revealed the extent of its scheme. *First*, while Wohl and Leung were still with CohnReznick, Mazars induced Wohl and, upon information and belief, Leung, to usurp CohnReznick's business opportunities by

scheming with DeMeola to delay meeting with potential CohnReznick clients until Wohl and Leung had joined DeMeola at Mazars.

9.      ***Second***, while still with CohnReznick, Mazars induced Wohl and, upon information and belief, Leung, to collude with DeMeola and lure CohnReznick's clients to Mazars. In fact, Wohl and DeMeola created and exchanged a master client "transition" list and communicated with CohnReznick clients to join Mazars.  Upon information and belief, Mazars told DeMeola, Wohl and Leung that they did not have to comply with the provision in the Partnership Agreement requiring them to compensate CohnReznick for lost clients.

10.      ***Third***, Mazars induced Wohl and Leung to send CohnReznick's confidential and proprietary financial information and trade secrets, including formulas, confidential client pricing models, budgets, fees, profits, margins, and client pitch materials, to not only DeMeola but others at Mazars in breach of the Partnership Agreement.  To be sure, at all relevant times, CohnReznick implemented multiple programs and policies specifically devoted to preventing the improper dissemination of such confidential and valuable information.

11.      With CohnReznick's confidential and proprietary information and trade secrets in hand, Mazars then further solicited CohnReznick's long-time customers with the goal of convincing them to move their business away from CohnReznick and to Mazars.  Mazars' scheme has been successful: as of March 2020, at least 52 CohnReznick clients—representing over $1.6 million in revenue generated in the 12 months before they left CohnReznick—have already decided to leave CohnReznick and retain Mazars.

12.      While Mazars was already aware of the restrictions contained in CohnReznick's Partnership Agreement prior to November 2019, CohnReznick also sent a letter to Mazars on November 27, 2019, citing to and quoting the provisions of the Partnership Agreement, and

demanding that Mazars: (a) immediately cease and desist from aiding and encouraging DeMeola, Leung and Wohl to breach the Partnership Agreement; (b) search for and provide CohnReznick a list, in writing, of each individual and entity that received documents and information concerning CohnReznick or its clients including, but not limited to, budgets and customers lists; (c) return all copies of any documents within Mazars' possession, custody or control concerning CohnReznick or its clients including, but not limited to, budgets and customers lists; and (d) represent, in writing, to CohnReznick that all such documents have been returned.

13.     Mazars refused to comply with any of CohnReznick's demands.  In fact, prior to the filing of this action, Mazars did not formally address the issues that CohnReznick raised in its letter.  Even more alarmingly, even after receiving CohnReznick's November 27, 2019 letters (again citing to and quoting the Partnership Agreement), and even after this action was filed, Mazars knowingly caused more clients and employees to leave CohnReznick for Mazars in breach of the Partnership Agreement.

14.     As a result, CohnReznick brings this action to enforce its statutory, contractual and common law rights.  Unless Mazars is stopped, CohnReznick will continue suffering substantial damages, including loss of goodwill, business opportunities and reputation caused by Mazars' misconduct.

## **PARTIES**

15.     CohnReznick LLP is a limited liability partnership duly formed and existing under the laws of the State of New Jersey with a principal place of business at 1301 Avenue of the Americas, New York, New York 10019.

16.     Mazars USA LLP is a limited liability partnership duly formed and existing under the laws of the State of New York with a principal place of business at 135 West 50th Street, New York, New York 10020.

## JURISDICTION AND VENUE

17.     This is an action for injunctive relief and to recover damages arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.  This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and supplemental jurisdiction over CohnReznick's state-law causes of action under 28 U.S.C. § 1367.

18.     This Court has jurisdiction over Mazars because it is located in the State of New York and transacts business in the State of New York and because this action arises from Mazars' activities in the State of New York.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b)-(d) because, among other reasons, Mazars is subject to personal jurisdiction in this District and has committed and continues to commit unlawful acts in this District.

## FACTS COMMON TO ALL CAUSES OF ACTION

**I.     CohnReznick is a Leader in the Highly Competitive Accounting Industry**

20.     CohnReznick is a national accounting, tax and business advisory firm with offices across the United States and several subsidiaries around the globe, including in the Cayman Islands, Chennai, Hong Kong, Sydney and the Netherlands.  CohnReznick ranks among the largest accounting, tax and business advisory firms in the United States.

21.     The global accounting, tax and business advisory market is highly competitive. CohnReznick competes for market share with global firms such as Deloitte, Ernst & Young, KPMG, PricewaterhouseCoopers, McGladrey, Grant Thornton, CBIZ/Mayer Hoffman McCann, BDO, Crowe Horwath, CliftonLarsonAllen and Mazars.

22.     Because of the cut-throat competition, success in the accounting, tax and business advisory industry is dependent on several factors, including developing and maintaining top talent,

developing and maintaining special relationships with clients and creating and adapting confidential and proprietary information and trade secrets to meet client needs and preferences.

**I.   DeMeola, Wohl and Leung Agree to Be Bound by CohnReznick's Partnership Agreement**

23.     DeMeola, Wohl and Leung were each longtime CohnReznick partners working out of the firm's New York office.

24.     DeMeola joined CohnReznick in 1999, became the Managing Partner of the New York office in or about 2005 and became the firm's Chief Operating Officer in February of 2010.

25.     Wohl joined CohnReznick in 2001 and became a partner in 2014.

26.     Leung joined CohnReznick in 2005 and became a partner in 2011.

27.     DeMeola, Wohl and Leung are sophisticated Certified Public Accountants with decades of experience.  CohnReznick paid them handsomely.

28.     As a condition of their partner status and as consideration for the handsome compensation they received from CohnReznick, DeMeola, Wohl and Leung agreed to be bound by the Partnership Agreement.  A true and correct copy of the Partnership Agreement is attached hereto as **Exhibit 1**.

**A.   DeMeola, Wohl and Leung Agreed Not to Disclose CohnReznick's Confidential Information and Trade Secrets**

29.     To create and maintain a competitive advantage, CohnReznick invests considerable resources developing information, methods and techniques to, among other things: identify potential clients; develop relationships with clients; learn the needs of clients; develop novel proprietary technologies and business methods to deliver services to suit clients' particular needs and preferences; and develop pricing models to attract and maintain clients while driving continued growth.  These methods, techniques and information are not obtainable from public sources and constitute confidential and proprietary information and trade secrets.

30.     As partners, DeMeola, Wohl and Leung had access to CohnReznick's software, programs, manuals, drawings, designs, writings, data, notes, memoranda, proposals, work plans, interim and final reports, project files, client contracts and records, and other tangible manifestations of any confidential information of CohnReznick (the "Materials"). *See* Partnership Agreement § 5.7(a)(2).

31.     As partners, DeMeola, Wohl and Leung also had access to information of a confidential and proprietary nature concerning CohnReznick and its clients, including client lists, client history and service reports detailing key client points of contact, budgets, accounts receivable history, customized pricing models used by CohnReznick on a customer-by-customer basis, client pitch information, client service and operation strategies, marketing strategies and techniques, and detailed service models (together with Materials, collectively "Confidential Information and Trade Secrets").

32.     CohnReznick's Confidential Information and Trade Secrets are not obtainable from public sources.   In order to protect such information, CohnReznick implemented multiple programs and policies specifically devoted to informational security, as set forth below.   All CohnReznick personnel, including every CohnReznick employee and partner, are required to comply with these policies.

33.     For example, CohnReznick utilized an eight-page Written Information Security Program ("WISP") to "define, document, and support the implementation and maintenance of administrative, technical, and physical safeguards to protect" its Confidential Information and Trade Secrets.   The WISP covers, among other confidential information, "[a]ny information obtained from a prospective, existing or prior client that is not available to the public" as well as "any information collected, created, processed used or retained by CohnReznick that is not

available to the public," in any format and on any media, whether electronic or in paper form.  To ensure CohnReznick properly protects its Confidential Information and Trade Secrets, the WISP adopts comprehensive protocols, including: (i) designating an Information Security Coordinator to implement, supervise, and maintain the WISP; (ii) controlling user identification and authentication through assigning passwords to personnel; (iii) utilizing multi-factor authentication and encryption tools for cloud-based access; (iv) restricting access to Confidential Information and Trade Secrets to personnel on a need-to-know basis; (v) storing records containing Confidential Information and Trade Secrets in secure facilities; and (vi) regularly testing and monitoring its safeguards.

34.     At all relevant times, CohnReznick also maintained a Computer and Data Security Policy designed to protect sensitive client and Partnership information.  Specifically, all personnel are required to strictly adhere to the following policies, among others: (i) not to share Confidential Information and Trade Secrets with others unauthorized to view such data; (ii) to encrypt any confidential client information transmitted across email, including billing information and financial information; and (iii) not to store client documents and files on external hard drives or devices.

35.     At all relevant times, CohnReznick maintained an Email Use Policy governing the access to and use of email accounts by its personnel.  Under the terms of this policy, all CohnReznick personnel are expressly forbidden from using their CohnReznick email accounts to engage in unauthorized not-for-profit business activities or transmit Confidential Information and Trade Secrets to external locations or devices.

36.     Because CohnReznick's Confidential Information and Trade Secrets is the heart of CohnReznick's business, and to protect its legitimate business interests, CohnReznick specifically

requires partners, such as DeMeola, Wohl and Leung, to further agree not to disclose Confidential Information and Trade Secrets outside of CohnReznick as a condition of belonging to the Partnership.[1] *See* Partnership Agreement § 5.3; *see also id.* § 5.7(e) ("All Materials and related Intellectual Property rights are the sole and exclusive property of the Partnership, are the confidential information of the Partnership . . . and shall be protected by each Partner in accordance with the terms of Section 5.3"). DeMeola, Wohl and Leung also agreed to return to CohnReznick all Confidential Information and Trade Secrets promptly after their retirement, withdrawal or termination from CohnReznick.  *Id.* § 5.7(e).

### B.   DeMeola, Wohl and Leung Agreed Not to Solicit or Hire CohnReznick Personnel

37.   Depending on seniority and experience, losing an employee or partner to a competitor can cost CohnReznick hundreds of thousands of dollars.  There are also substantial intangible costs of losing an employee or partner, including impact to the firm's culture, the diversity of the firm population, the quality of advice provided to clients and firm reputation. Being able to retain top talent is thus one of CohnReznick's keys to success.

38.   CohnReznick employs a number of strategies for reducing some of the risk of employee and partner turnover, including non-solicitation agreements.   The Partnership Agreement provides that, for two years after a partner's retirement, withdrawal or termination (the "Termination Date"), the partner may not "directly or indirectly, solicit, employ, interfere with or entice from the Partnership or any affiliate of the Partnership" any employee or partner that worked for CohnReznick during the twelve months prior to the Termination Date (a "Solicited

---

[1] DeMeola, Wohl and Leung acknowledged that the Confidential Information and Trade Secrets constitute "a unique and valuable asset of the Partnership and represents a substantial investment of time and expense by the Partnership, and that any disclosure or other use of such confidential information other than for the sole benefit of the Partnership would be wrongful and would cause irreparable harm to the Partnership."  *Id.* § 5.3.

Employee"). *See* Partnership Agreement § 14.3(a). Although the mere employment of a Solicited Employee is a breach of the Partnership Agreement, a partner also violates the non-solicitation provision if the partner is, for example, "in any way involved in a decision to hire" or is "involved in a solicitation by a firm with which the Ex-Partner is an employee, partner or otherwise affiliated (an "Affiliated Entity")." *Id*.

39.     If a Solicited Employee is hired by DeMeoloa, Wohl and Leung or an Affiliated Entity, DeMeola, Wohl and Leung agreed to pay CohnReznick the greater of: (1) $50,000; or (2) 50% of the Solicited Employee's compensation and benefits for the 12 months before they left CohnReznick. *Id*. § 14.3(b)-(c).

40.     DeMeola, Wohl and Leung further agreed that any breach or threatened breach of the non-solicitation provision would cause irreparable injury to CohnReznick and that money damages would not provide an adequate remedy to CohnReznick. *Id.* § 14.3(a). Thus, in addition to money damages, CohnReznick may obtain injunctive relief without posting a bond. *Id*.

41.     Mazars has argued that the non-solicitation provision in the Partnership Agreement is inapplicable to partners because one particular sentence of Section 14.3(a) refers only to the solicitation of "an employee or former employee." Mazars is wrong. Section 14.3(b) provides CohnReznick with a remedy if an Affiliated Entity hires "an individual who was an employee ***or Partner of the Partnership***" and, as a result, the totality of Section 14.3 would be rendered meaningless if the provision did not restrict the solicitation or hiring of former CohnReznick partners.

42.     Indeed, as CohnReznick's Chief Operating Officer, DeMeola was well aware that the non-solicitation provision precluded the solicitation of partners, represented that fact internally on numerous occasions, and, as a long-term member of CohnReznick's Executive Board, was

uniquely aware of the intent of the provision and was involved in numerous discussions regarding the enforcement of the covenants in the Partnership Agreement, including the provision to prevent solicitation of partners.  Mazars was made fully aware of these facts before taking its current, and baseless, position that section 14.3 is inapplicable to partners.

### C. DeMeola, Wohl and Leung Are Required to Compensate CohnReznick for any CohnReznick Clients They Service at a Different Firm Like Mazars

43.       The Partnership Agreement provides that if DeMeola, Wohl and Leung retire, withdraw or are terminated from CohnReznick, but continue engaging in activities similar to those CohnReznick conducts, DeMeola, Wohl and Leung must compensate CohnReznick for any clients serviced by their new firm.  *See generally* Partnership Agreement § 11.4.

44.       Specifically, DeMeola, Wohl and Leung are required to compensate CohnReznick if: (a) they engage in business activities similar to those conducted by CohnReznick—either individually or as a partner, shareholder, member, employee, consultant, contractor or affiliate of some other entity (collectively, the "Servicer"); and (b) the Servicer provides any type of "service"[2] to a "client of the Partnership."[3] *Id*. § 11.4.

45.        DeMeola, Wohl and Leung are required to pay CohnReznick, as compensation for lost clients, either: (a) 50% of the gross fees earned by the Servicer commencing on the date any service is first rendered by the Servicer to the client of the Partnership and ending three years thereafter; or (b) at CohnReznick's election, 150% of gross fees collected by CohnReznick during

---

[2] "Service" is defined in the Partnership Agreement as "any kind similar to or competitive with a service offered by the Partnership or any affiliate of the Partnership, provided, such service (to a 'client of the Partnership') commences within two years of the latter to occur of (i) the Ex-Partner's withdrawal or termination, or (ii) the termination of any employment or consulting relationship the Ex-Partner may have with the Partnership subsequent to his or her withdrawal or termination as a Partner." *Id*. § 11.4(a)(1).

[3] "Client of the Partnership" is defined in the Partnership Agreement as "any person or entity who was a client of the Partnership or Reznick or any affiliate of the Partnership or Reznick at any time within the period commencing three years prior to the Termination Date." *Id*. § 11.4(a)(2).

the last twelve months preceding the Termination Date. *Id*. § 11.4(b).  CohnReznick may elect its compensation on or before the 60th day after CohnReznick learns the Servicer is serving a client of the Partnership. *Id*.

46.     Additionally, DeMeola, Wohl and Leung agreed to purchase, at face value, any unpaid receivables due and work in progress charged to the "client of the Partnership" that they serviced existing at the time they first began servicing the "client of the Partnership" at Mazars. *See id*. § 11.4(c).

47.     Finally, DeMeola, Wohl and Leung agreed to promptly inform CohnReznick after becoming obligated to compensate CohnReznick for lost clients, provide CohnReznick with an accounting and make their "records available for inspection in the event an inquiry is made as to whether any, and the extent of, services were rendered by a Servicer to a 'client of the Partnership.'" *Id*. § 11.4(e).

## II.   Mazars Intentionally and Repeatedly Interferes with CohnReznick's Contractual Relationship With DeMeola, Wohl and Leung

48.     In November of 2018, DeMeola retired as a partner from CohnReznick after nearly 20 years with the firm.  DeMeola's retirement was effective as of the close of business on January 31, 2019.

49.     However, after claiming to be "retiring" from CohnReznick, DeMeola joined Mazars.  Mazars carried-out a carefully-orchestrated scheme to obtain a competitive advantage by encouraging DeMeola and two other CohnReznick partners—Wohl and Leung—to breach the Partnership Agreement and their common law duties and violate controlling state and federal law.

### A.  Mazars Encourages DeMeola, Wohl and Leung to Breach Their Agreement Not to Solicit or Hire Other Partners or Employees

50.     DeMeola joined Mazars in November of 2019.  *See* Robert DeMeola, LINKEDIN, https://www.linkedin.com/in/robert-demeola-1237752a (last visited Dec. 10, 2019).

51.     Mazars knew, even before each former partner left CohnReznick, that DeMeola, Wohl, and Leung were bound by the partner and employee non-solicitation provisions contained in the Partnership Agreement.  Notwithstanding Mazars' knowledge of such provisions, Mazars encouraged DeMeola to solicit two former CohnReznick partners—Leung and Wohl—to also join Mazars in breach of the Partnership Agreement.

52.     DeMeola's and Mazars' efforts to poach Leung and Wohl were successful as they left CohnReznick for Mazars in November of 2019.   *See* Alan Wohl, LINKEDIN, https://www.linkedin.com/in/alanmwohl/ (last visited Dec. 10, 2019); Howard Leung, LINKEDIN, https://www.linkedin.com/in/howard-leung-8b393511 (last visited Dec. 10, 2019).

53.     DeMeola, fully aware of his obligations under the Partnership Agreement, reached out to CohnReznick the night before Leung and Wohl intended to announce they were leaving CohnReznick to join DeMeola at Mazars.  DeMeola acknowledged his obligations under the Partnership Agreement and ***conceded*** that he solicited Leung and Wohl to leave CohnReznick and join Mazars in breach of the Partnership Agreement.  DeMeola even asked CohnReznick whether another CohnReznick employee ("Employee 1") was covered by the Partnership Agreement's provisions regarding employee solicitation.  CohnReznick reiterated that such provisions applied to Employee 1, along with any other partners or employees solicited to Mazars.

54.     The very next day, the Chief Executive Officer of Mazars called CohnReznick's Chief Executive Officer to discuss the Partnership Agreement's non-solicitation provisions.  On that call, Mazars acknowledged the Partnership Agreement's non-solicitation provision as well as Wohl and Leung's obligations relating to same.

55.     To be sure, CohnReznick emphasized the Partnership Agreement's partner and employee non-solicitation provisions to Mazars in subsequent demand letters and conversations

between the parties.  Yet, Mazars did subsist and, was, like DeMeola, Wohl and Leung, undeterred.

56.      To the contrary, Mazars doubled down on its misconduct: Mazars encouraged DeMeola, Wohl and Leung to solicit several former CohnReznick employees to join them at Mazars even after being put on notice of the Partnership Agreement's non-solicitation provisions.

57.      In January 2019, Employee 1 left CohnReznick to join Mazars.  In total, at least four former employees left CohnReznick and joined Mazars as a result of the former partners' improper solicitation.  And, upon information and belief, at least two former partners reached out to additional CohnReznick employees and attempted to solicit them to join Mazars as well.

**B.  Mazars uses Confidential Information and Trade Secrets DeMeola, Wohl and Leung Took From CohnReznick to Solicit and Retain CohnReznick's Clients**

58.      To compete in the marketplace, Mazars convinced DeMeola and Wohl and, upon information and belief, Leung to steal, disclose and use CohnReznick's Confidential Information and Trade Secrets in violation of the Partnership Agreement.

59.      In fact, while still CohnReznick partners, Wohl and Leung sent Confidential Information and Trade Secrets, including information about CohnReznick's clients, not only to their personal email accounts but also to DeMeola and others at Mazars.  For example, on October 10, 2019, Leung sent an email from his CohnReznick email address to his personal email account attaching a spreadsheet of CohnReznick's budget in respect of audits and reviews performed for one of CohnReznick's clients (the "Budget Sheet").  The Budget Sheet contained sensitive information, including (i) the amount of hours allocated to associates, managers, partners, and other CohnReznick personnel for the engagements; (ii) the hourly rates charged by such personnel; (iii) the amount of fees earned by CohnReznick; and (iv) the realization rate on all audit engagements.  The Budget Sheet also revealed the specific inputs and formula used by CohnReznick to calculate projected gross margin percentages.

60.     On October 21, 2019, Leung again emailed his personal email account attaching a thirty-page "proposal to provide audit, tax, and cost segregation services" originally prepared by CohnReznick in December 2018 for a prospective client (the "Pitch Deck").  CohnReznick spent considerable time and resources preparing and refining the Pitch Deck, which detailed among other confidential pricing information, certain unconventional tools utilized by CohnReznick to create value for its clients and a schedule of quoted fees for the prospective engagement.

61.     Just eight days later, on October 29, 2019, Wohl sent an email from his CohnReznick email address to DeMeola, copying Wohl's personal email account, with the subject line "as requested."  In that email, Wohl attached an excel spreadsheet containing the following information for 42 of CohnReznick's "Master Clients": (i) amounts invoiced/billed by CohnReznick; (ii) net production; (iii) billable hours; (iv) labor costs; (v) client charges; (vi) profit; and (vii) gross margins (the "Master Client List").  The Confidential Information and Trade Secrets in the Budget Sheet, Pitch Deck, and Master Client List are not just ordinary client lists and are precisely the type of proprietary formulas, pricing models, budgetary information, confidential client pricing data, and client pitch materials that CohnReznick sought to protect through its implementation of the Partnership Agreement, WISP, Computer and Data Security Policy, and Email Use Policy.

62.     In the weeks leading up to their departure from CohnReznick, Wohl and Leung forwarded a multitude of additional Confidential Information and Trade Secrets from their CohnReznick email addresses to their personal email accounts.  This included, among other information, (i) working cash flow projections for a CohnReznick client, (ii) upon information and belief, trust and LLC documents for another CohnReznick client, (iii) copies of invoices distributed by CohnReznick, and (iv) detailed notes concerning Wohl's engagements.  With CohnReznick's

Confidential Information and Trade Secrets in hand, Mazars, DeMeola and Wohl, and, upon information and belief, Leung, used the Confidential Information and Trade Secrets in an organized and systematic effort to improperly compete against CohnReznick and solicit CohnReznick's clients.

63.     Upon information and belief, Mazars solicited CohnReznick's clients by, among other things, sending emails to CohnReznick's clients, and initiating, attending and participating in meetings with CohnReznick's clients during which they pitched Mazars' services and asked CohnReznick's clients to direct their business to Mazars.  To be sure, Mazars maintained a unique advantage over CohnReznick given its extensive knowledge of CohnReznick's client pitch materials, budgets, confidential client pricing history, labor costs, profit calculations, and other Confidential Information and Trade Secrets obtained through Wohl and Leung.   With CohnReznick's confidential pricing history for each client in hand, Mazars was given an unfair advantage to solicit CohnReznick clients with better pricing terms.

64.     CohnReznick has learned that Mazars, DeMeola, Wohl and Leung's efforts have been successful as at least 52 CohnReznick clients, including 27 from the Master Client List, have decided to leave CohnReznick and retain Mazars.  These clients represented at least $1.6 million in gross fees collected within the last 12 months before they left CohnReznick.

65.     At all relevant times, Mazars was well aware that DeMeola, Wohl, and Leung were bound by the Partnership Agreement's client non-solicitation provisions given the firm's involvement in a similar dispute with CohnReznick *three years* ago.  Specifically, in or around January 2017, a partner from CohnReznick withdrew from the partnership to join Mazars, where such partner continued to service multiple CohnReznick clients.  Mazars ultimately agreed to pay CohnReznick a settlement amount in satisfaction of monies owed by the former CohnReznick

- 17 -

partner pursuant to Section 11.4 of the Partnership Agreement.  Notwithstanding such knowledge, Mazars intentionally misappropriated Confidential Information and Trade Secrets, and used such information to solicit CohnReznick's clients away from CohnReznick and to Mazars.

## III.  CohnReznick's Investigation Reveals that Mazars Encouraged Wohl and Leung to Breach Their Fiduciary Duties

66.     As CohnReznick partners, Wohl and Leung owed CohnReznick fiduciary duties, including duties of loyalty.[4]

67.     Mazars knew that, as CohnReznick partners, Wohl and Leung owed CohnReznick fiduciary duties.

68.     CohnReznick's initial investigation revealed that Wohl and Leung breached their common law duties of loyalty while still partners at CohnReznick.

69.     In fact, DeMeola, Wohl and Leung withheld potential new client opportunities from CohnReznick.  In just one instance, on October 16, 2019, Wohl sent an email to DeMeola—who by that time was with Mazars—boasting that he was delaying meeting at least two potential CohnReznick clients until he joined Mazars.  Wohl explained to DeMeola that the two potential engagements could be worth at least $170,000 in fees.  Mazars did nothing to discourage this conduct and, instead, knowingly permitted it to continue.

70.     Moreover, CohnReznick uncovered substantial evidence showing that Wohl began working with Mazars to poach CohnReznick's clients and prospective clients while he was still with CohnReznick.

---

[4] In fact, such fiduciary duties are memorialized in CohnReznick's firm-wide "Code of Conduct," which expressly forbids the firm's partners from engaging (i) "in any conduct or enterprise that constitutes a conflict with the best interests" of CohnReznick or (ii) "directly or indirectly in any for-profit, personal transaction or arrangement derived from or based upon his or her position or authority" at CohnReznick.

71.     For example, on October 16, 2019, Wohl emailed DeMeola confidential, payment-related information in respect of a "new client" that Wohl had already engaged "for a few months" while still at CohnReznick.  Wohl assured DeMeola that the CohnReznick client "already told [Wohl] he is moving" with him to Mazars.

72.     Moreover, on November 7, 2019—just days before Wohl left CohnReznick—Wohl emailed a partner at Mazars setting forth a detailed proposal for Mazars to engage another one of CohnReznick's prospective clients.   Upon information and belief, Wohl met with the same prospective client on October 25, 2019, while still with CohnReznick.

73.     Indeed, DeMeola, Wohl and Leung absconded with CohnReznick's Confidential Information and Trade Secrets, which Mazars, in turn, used to poach CohnReznick's clients. CohnReznick has been substantially harmed by Mazars' misconduct.

## IV.   Mazars Disregards CohnReznick's Formal Demands that Mazars Stop Interfering With CohnReznick's Contractual Relationship With DeMeola, Leung and Wohl

74.     CohnReznick sent a letter to Mazars on November 27, 2019, citing to and quoting the Partnership Agreement, demanding that it: (a) immediately cease and desist from aiding and encouraging DeMeola, Leung and Wohl to breach the Partnership Agreement; (b) search for and provide CohnReznick a list, in writing, of each individual and entity that received documents and information concerning CohnReznick or its clients including, but not limited to, budgets and customers lists; (c) return all copies of any documents within Mazars' possession, custody or control concerning CohnReznick or its clients including, but not limited to, budgets and customers lists; and (d) represent, in writing, to CohnReznick that all such documents have been returned.

75.     The deadlines CohnReznick imposed in the letter came and went without Mazars committing to ceasing its misconduct or to even formally respond to the letter.

76.      In fact, rather than cooperate with CohnReznick's requests, Mazars caused more clients and employees, including Employee 1, to leave CohnReznick for Mazars after the letter was sent.  In fact, Mazars even hired at least one employee after this action was commenced.  Thus, despite being on notice of the Partnership Agreement's non-solicitation provisions in 2017 and again, in October and November 2019, Mazars engaged in intentional acts designed to violate CohnReznick's contractual, common law, and statutory rights.

## CAUSES OF ACTION

### COUNT 1

**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.)**

77.      CohnReznick restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

78.      As fully set forth in detail in paragraphs 29 to 31 and 59 to 62 above, CohnReznick's Confidential Information and Trade Secrets include information related to its current and prospective clients, including client lists, but also client history (including pricing history) and service reports detailing client points of contact, budgets, accounts receivable history, customized pricing models used by CohnReznick on a customer-by-customer basis, client pitch information, client service and operation strategies, marketing strategies and techniques, and detailed service models.

79.      CohnReznick's Confidential Information and Trade Secrets are of independent economic value to CohnReznick as they are the result of CohnReznick's investment in identifying clients, cultivating relationships with those clients, and negotiating and providing services to those clients.

80.     CohnReznick's Confidential Information and Trade Secrets are valuable to CohnReznick because its relationships with clients are the lifeblood of CohnReznick's business model.

81.     CohnReznick's Confidential Information and Trade Secrets would be invaluable to any entity interested in entering or expanding its footprint in the accounting, tax and business advisory industry because the Confidential Information and Trade Secrets would allow that entity to capitalize on client leads and pricing strategies with far less investment of time and resources than would be needed to develop the leads and strategies independently.

82.     CohnReznick's Confidential Information and Trade Secrets are not generally known to the general public or others within the accounting, tax and business advisory industry.

83.     To the extent CohnReznick has disclosed its Confidential Information and Trade Secrets to DeMeola, Wohl and Leung, it has done so because of their positions of trust and pursuant to the terms of the Partnership Agreement that expressly prohibit the unauthorized use or disclosure of Confidential Information and Trade Secrets.

84.     CohnReznick's Confidential Information and Trade Secrets (including its detailed pricing history with each of its clients) are not readily ascertainable by another person without a significant expenditure of time, expense and effort.

85.     As set forth fully in paragraphs 32 to 36 above, CohnReznick has taken reasonable measures to maintain the secrecy of its Confidential Information and Trade Secrets by, among other things, requiring that its employees and partners enter into written non-disclosure agreements and implementing robust information security policies, including the WISP, Computer and Data Security Policy, and Email Use Policy.

86.     CohnReznick's Confidential Information and Trade Secrets relate to products and services used in, or intended for use in, interstate or foreign commerce.

87.     DeMeola, Wohl and Leung, by virtue of their relationship with CohnReznick, had access to CohnReznick's Confidential Information and Trade Secrets, but was at all relevant times—including after leaving CohnReznick—under a duty to maintain the secrecy of CohnReznick's Confidential Information and Trade Secrets pursuant to the terms of the Partnership Agreement.

88.     Consistent with the terms of the Partnership Agreement, DeMeola, Wohl and Leung were aware that CohnReznick endeavored to maintain the secrecy of its Confidential Information and Trade Secrets.

89.     Mazars misappropriated, and continues to misappropriate, the Confidential Information and Trade Secrets by disclosing and using them to solicit CohnReznick's customers throughout the United States, including in New York and this District, while knowing or having reason to know that the Confidential Information and Trade Secrets were acquired through improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, and/or from persons, such as DeMeola, Wohl and Leung, who owed a duty to CohnReznick (both contractually and under common law) to maintain their secrecy and limit their use.

90.     As set forth fully in paragraphs 58 to 65 above, Mazars misappropriated and acquired CohnReznick's Confidential Information and Trade Secrets through improper means, including: (a) inducing DeMeola, Wohl and Leung, to obtain and disclose the Confidential Information and Trade Secrets in violation of the Partnership Agreement; (b) receiving and using the Confidential Information and Trade Secrets for Mazars' benefit, while knowing, or having reason to know, that such information had been acquired by unlawful or improper means; and (c)

receiving and using the Confidential Information and Trade Secrets for Mazars' benefit while knowing, or having reason to know, that such information was acquired under circumstances giving rise to a duty to maintain the secrecy of the Confidential Information and Trade Secrets or limit the use of the Confidential Information and Trade Secrets.

91.     Mazars intentionally misappropriated the Confidential Information and Trade Secrets and continues to use the Confidential Information and Trade Secrets to solicit CohnReznick's clients away from CohnReznick and to Mazars.

92.     The wrongful disclosure and/or use of CohnReznick's Confidential Information and Trade Secrets has given, and continues to give, Mazars an unfair benefit and wrongful advantage in the marketplace over CohnReznick, the rightful owner of CohnReznick's Confidential Information and Trade Secrets.

93.     Mazars' misappropriation of CohnReznick's Confidential Information and Trade Secrets has been and continues to be both willful and malicious.

94.     Mazars' misappropriation of CohnReznick's Confidential Information and Trade Secrets is ongoing in nature.

95.     As a direct and proximate result of Mazars' unlawful misappropriation of CohnReznick's Confidential Information and Trade Secrets as described above, CohnReznick has sustained actual damages, and will continue to accrue and sustain such damage in the future on an ongoing and continuing basis.

96.     As a direct and proximate result of Mazars' unlawful misappropriation of CohnReznick's Confidential Information and Trade Secrets as described above, CohnReznick has suffered irreparable harm, and will continue to suffer such harm unless and until Mazars' wrongful conduct is enjoined.

97.     CohnReznick is entitled to injunctive relief enjoining and restraining Mazars from directly or indirectly using and/or disclosing CohnReznick's Confidential Information and Trade Secrets to any third-party.  CohnReznick is also entitled to an Order directing Mazars to return all copies of any Confidential Information and Trade Secrets in their possession, custody or control to CohnReznick.

98.     CohnReznick is also entitled to compensatory and statutory damages in an amount to be determined at trial, punitive damages for Mazars' intentional and malicious misconduct in an amount to be determined at trial, pre-judgment and post-judgment interest, and attorneys' fees and costs.

99.     Mazars' misappropriation of CohnReznick's Confidential Information and Trade Secrets was willful and malicious.  As such, CohnReznick is entitled under 18 U.S.C. § 1836 to exemplary damages equal to twice its actual damages caused by the misappropriation, as well as all reasonable attorneys' fees and costs.

### <u>COUNT 2</u>
**(Tortious Interference with the Partnership Agreement)**

100.    CohnReznick restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

101.    In the Partnership Agreement, DeMeola, Wohl and Leung agreed not to "directly or indirectly, solicit, employ, interfere with or entice from the Partnership or any affiliate of the Partnership" a Solicited Employee.  *See* Partnership Agreement § 14.3.

102.    In the Partnership Agreement, DeMeola, Wohl and Leung agreed to compensate CohnReznick if: (a) they individually or as a Servicer engage in business activities similar to those conducted by CohnReznick; and (b) they or the Servicer provides any type of "service" to a "client of the Partnership."  *See* Partnership Agreement § 11.4.

103.     DeMeola, Wohl and Leung also agreed to purchase, at face value, any unpaid receivables due and work in progress charged to the "client of the Partnership" that they serviced existing at the time they first began servicing the "client of the Partnership" at Mazars.  *Id*. § 11.4(c).

104.     DeMeola, Wohl and Leung agreed to promptly inform CohnReznick after becoming obligated to compensate CohnReznick for lost clients, provide CohnReznick with an accounting and make their "records available for inspection in the event an inquiry is made as to whether any, and the extent of, services were rendered by a Servicer to a 'client of the Partnership.'"  *Id*. § 11.4(e).

105.     DeMeola, Wohl and Leung, agreed in the Partnership Agreement not to disclose Confidential Information and Trade Secrets outside of CohnReznick. *See* Partnership Agreement § 5.3; *see also* Partnership Agreement § 5.7(e).

106.     DeMeola, Wohl and Leung also agreed to return to CohnReznick all Confidential Information and Trade Secrets promptly after their retirement, withdrawal or termination from CohnReznick.  *Id.* § 5.7(e).

107.     As noted above, Mazars knew that DeMeola, Wohl and Leung were bound by the Partnership Agreement and the covenants contained therein as early as approximately three years ago and were again put on notice of it when CohnReznick sent demand letters in November 2019.

108.     As set forth in detail above, Mazars, with knowledge of the Partnership Agreement, intentionally and improperly used improper means to prevent CohnReznick, DeMeola, Wohl and Leung from rendering full performance of the Partnership Agreement by aiding and encouraging DeMeola, Wohl and Leung to violate the Partnership Agreement in numerous ways.

109.     Upon information and belief, Mazars told DeMeola, Wohl and Leung that they did

not have to comply with the provisions at issue in the Partnership Agreement.

110.     This wrongful conduct was undertaken with the sole intent of interfering with the Partnership Agreement or rendering performance under the Partnership Agreement impossible.

111.     CohnReznick is entitled to compensatory damages in an amount to be determined at trial, punitive damages for Mazars' intentional and malicious misconduct in an amount to be determined at the trial, pre-judgment and post-judgment interest, and attorneys' fees and costs.

### COUNT 3
**(Aiding and Abetting Breach of Fiduciary Duty)**

112.     CohnReznick restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

113.     As partners of CohnReznick, Wohl and Leung owed fiduciary duties to CohnReznick, including a fiduciary duty of loyalty.

114.     Wohl and, upon information and belief, Leung negligently and/or intentionally failed to act in good faith and solely for the benefit of CohnReznick by, among other things, soliciting CohnReznick's clients to join Mazars, misappropriating CohnReznick's Confidential Information and Trade Secrets, including confidential client pricing data, and delaying meeting at least two potential CohnReznick clients until they joined Mazars.

115.     Mazars was aware that Wohl and Leung owed fiduciary duties to CohnReznick but, upon information and belief, knowingly and substantially assisted Wohl and, upon information and belief, Leung, to breach their fiduciary duties.

116.     Upon information and belief, Mazars aided and abetted Wohl and Leung's breach of fiduciary duty by, among other things, instructing Wohl and Leung to misappropriate CohnReznick's Confidential Information and Trade Secrets, solicit CohnReznick's clients to join Mazars and delay meeting potential CohnReznick clients until they joined Mazars.

117.     As a result, CohnReznick is entitled to compensatory damages in an amount to be determined at trial, punitive damages for Mazars' intentional and malicious misconduct in an amount to be determined at trial, pre-judgment and post-judgment interest, and attorneys' fees and costs.

## COUNT 4
### (Unjust Enrichment)

118.     CohnReznick restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

119.     Mazars intentionally and knowingly acquired CohnReznick's Confidential Information and Trade Secrets in violation of applicable law.

120.     CohnReznick provided DeMeola, Wohl and Leung the benefit of access to CohnReznick's Confidential Information and Trade Secrets for the explicit and limited purpose of DeMeola, Wohl and Leung using that information (including confidential client pricing history) on behalf of CohnReznick and not third parties like Mazars.

121.     At all times material hereto, Mazars would be unlawfully and unjustly enriched if it was allowed to enjoy the benefits derived from such proprietary and trade secret information without being required to compensate CohnReznick for conferring those benefits.

122.     The fair value of the benefits conferred on and obtained by Mazars is the value Mazars derived from obtaining and using CohnReznick's proprietary and trade secret information, including in Mazars' development, marketing, and provision of accounting, tax and business advisory services and other business purposes.

123.     Accordingly, Mazars has been unjustly enriched in an amount to be determined at trial, and CohnReznick is entitled to be paid that same amount.

124.     As a direct and proximate result of Mazars' wrongful conduct as described above, CohnReznick has sustained actual damages as described above, and will continue to accrue and sustain such damages in the future on an ongoing and continuing basis.

125.     Accordingly, CohnReznick is entitled to injunctive relief enjoining and restraining Mazars from directly or indirectly using and/or disclosing Confidential Information and Trade Secrets to any third-party.  CohnReznick is also entitled to an Order directing Mazars to return all copies of any Confidential Information and Trade Secrets in its possession, custody or control to CohnReznick.

126.     CohnReznick is also entitled to compensatory damages in an amount to be determined at trial, punitive damages for Mazars' intentional and malicious misconduct in an amount to be determined at trial, pre-judgment and post-judgment interest, and attorneys' fees and costs.

**COUNT 5**
**(Unfair Competition)**

127.     CohnReznick restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

128.     As fully set forth in detail in paragraphs 29 to 31 and 59 to 62 above, CohnReznick has devoted substantial amounts of labor, skill, and money to the development of its Confidential Information and Trade Secrets, including, without limitation, information related to its current and prospective clients, including client lists, but also client history (including pricing history) and service reports detailing client points of contact, budgets, accounts receivable history, customized pricing models used by CohnReznick on a customer-by-customer basis, client pitch information, client service and operation strategies, marketing strategies and techniques, and detailed service models.

129.     CohnReznick's Confidential Information and Trade Secrets are of independent economic value to CohnReznick as they are the result of CohnReznick's investment in identifying clients, cultivating relationships with those clients, and negotiating and providing services to those clients.

130.     CohnReznick's Confidential Information and Trade Secrets are not generally known to the general public or others within the accounting, tax and business advisory industry.

131.     CohnReznick's Confidential Information and Trade Secrets (including its detailed pricing history with each of its clients) are not readily ascertainable by another person without a significant expenditure of time, expense and effort.

132.     As set forth fully in paragraphs 32 to 36 above, CohnReznick has taken reasonable measures to maintain the secrecy of its Confidential Information and Trade Secrets by, among other things, requiring that its employees and partners enter into written non-disclosure agreements and implementing robust information security policies, including the WISP, Computer and Data Security Policy, and Email Use Policy.

133.     Upon information and belief, Mazars has engaged in an intentional course of conduct for the sole purpose of gaining an unfair commercial advantage over CohnReznick.

134.     Upon information and belief, Mazars' course of conduct includes, *inter alia*:

   a.  Raiding CohnReznick's personnel by soliciting and hiring multiple partners and CohnReznick employees;

   b.  Inducing DeMeola, Wohl and Leung to breach their contractual obligations and fiduciary duties to CohnReznick;

c. Misappropriating, in bad faith, CohnReznick's Confidential Information and Trade Secrets and using CohnReznick's Confidential Information and Trade Secrets for its own economic and commercial advantage;

d. Misappropriating, in bad faith, CohnReznick's labor, skills and expenditures in the development of CohnReznick's information related to its current and prospective clients to solicit CohnReznick's customers throughout the United States, including in New York and this District; and

e. Interfering with CohnReznick's prospective economic advantage.

135.    The foregoing unlawful conduct by Mazars constitutes unfair competition which has caused and will continue to cause damage to CohnReznick including, but not limited to, immediate, irreparable harm for which CohnReznick has no adequate remedy at law.

136.    CohnReznick is entitled to compensatory damages in an amount to be determined at trial, punitive damages for Mazars' intentional and malicious misconduct in an amount to be determined at the trial, pre-judgment and post-judgment interest, and attorneys' fees and costs.

<u>**COUNT 6**</u>
**(Misappropriation of Confidential Information)**

137.    CohnReznick restates and re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

138.    As fully set forth in detail in paragraphs 29 to 31 and 59 to 62 above, CohnReznick has devoted substantial amounts of labor, skill, and money to the development of Confidential Information and Trade Secrets, including, without limitation, information related to its current and prospective clients, including client lists, but also client history (including pricing history) and service reports detailing client points of contact, budgets, accounts receivable history, customized pricing models used by CohnReznick on a customer-by-customer basis, client pitch information,

client service and operation strategies, marketing strategies and techniques, and detailed service models.

139.     CohnReznick's Confidential Information and Trade Secrets are of independent economic value to CohnReznick as they are the result of CohnReznick's investment in identifying clients, cultivating relationships with those clients, and negotiating and providing services to those clients.

140.     CohnReznick's Confidential Information and Trade Secrets are not generally known to the general public or others within the accounting, tax and business advisory industry.

141.     CohnReznick's Confidential Information and Trade Secrets (including its detailed pricing history with each of its clients) are not readily ascertainable by another person without a significant expenditure of time, expense and effort.

142.     As set forth fully in paragraphs 32 to 36 above, CohnReznick has taken reasonable measures to maintain the secrecy of its this information by, among other things, requiring that its employees and partners enter into written non-disclosure agreements and implementing robust information security policies, including the WISP, Computer and Data Security Policy, and Email Use Policy.

143.     Mazars intentionally misappropriated the Confidential Information and Trade Secrets and/or may use it to continue to solicit CohnReznick's customers throughout the United States, including in New York and this District, from CohnReznick to Mazars at CohnReznick's expense.

144.     Mazars' misappropriation of CohnReznick's Confidential Information and Trade Secrets has been and continues to be both willful and malicious.

145.     Mazars' misappropriation of CohnReznick's Confidential Information and Trade Secrets is ongoing in nature.

146.     As a direct and proximate result of Mazars' unlawful misappropriation of CohnReznick's Confidential Information and Trade Secrets as described above, CohnReznick has sustained actual damages, and will continue to accrue and sustain such damage in the future on an ongoing and continuing basis.

147.     As a direct and proximate result of Mazars' unlawful misappropriation of CohnReznick's Confidential Information and Trade Secrets as described above, CohnReznick has suffered irreparable harm, and will continue to suffer such harm unless and until Mazars' wrongful conduct is enjoined.

148.     CohnReznick is entitled to injunctive relief enjoining and restraining Mazars from directly or indirectly using and/or disclosing CohnReznick's Confidential Information and Trade Secrets to any third-party.  CohnReznick is also entitled to an Order directing Mazars to return all copies of any Confidential Information and Trade Secrets in their possession, custody or control to CohnReznick.

149.     CohnReznick is also entitled to compensatory and statutory damages in an amount to be determined at trial, punitive damages for Mazars' intentional and malicious misconduct in an amount to be determined at trial, pre-judgment and post-judgment interest, and attorneys' fees and costs.

**WHEREFORE**, CohnReznick demands the following relief from Mazars:

A.   Actual and compensatory damages, including profits lost by CohnReznick and profits gained by Mazars, in amounts to be proven at trial but not less than $3.1 million;

B.   Damages in an amount to be determined at trial, including but not limited to, compensatory, contractual, liquidated, statutory and punitive damages for Defendants' intentional and malicious misconduct in an amount to be determined at trial;

C. Preliminary and permanent injunctive relief, including an Order: (a) requiring Mazars to return CohnReznick's Confidential Information and Trade Secrets; and (b) enjoining and restraining Mazars, and all of those acting in concert or cooperation with Mazars from directly or indirectly using and/or disclosing Confidential Information and Trade Secrets to any third-party, including Mazars;

D. Exemplary damages pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(C);

E. Attorneys' fees and costs, including as permitted by 18 U.S.C. § 1836(b)(3)(D);

F. Punitive damages and exemplary damages;

G. Pre-judgment and post-judgment interest; and

H. Such other and further relief as is deemed just and proper by the Court.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b), CohnReznick demands a trial by jury on all claims so triable of right.

Dated:   March 11, 2020
        New York, New York

**REED SMITH LLP**

<u>   **/s/ Casey Laffey**            </u>
By:  Casey D. Laffey
     Ian M. Turetsky
     599 Lexington Avenue
     Tel.: 212-549-0389
     Fax: 212-521-5450
     claffey@reedsmith.com
     ituretsky@reedsmith.com

*Attorneys for Plaintiff*
*CohnReznick LLP*
